UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------------
:
JAMIE GILBO, *et al.* :
: Case No. 1:19-cv-00767
Plaintiffs, :
:
vs. : OPINION & ORDER
: [Resolving Doc. 17]
AGMENT LLC, *et al.* :
:
Defendants. :
------------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Plaintiffs Jamie Gilbo and Alyssa Smith formerly worked as exotic dancers at Brass Pole, a strip club. Plaintiffs bring the present action against Agment LLC, d/b/a Brass Pole, and Harley Rowe, Brass Pole's owner, president, and managing member, claiming that Defendants misclassified Plaintiffs as independent contractors and failed to pay them the Fair Labor Standards Act ("FLSA") required minimum wage.[1]

Plaintiffs move for summary judgment on Counts I and II of the complaint on the grounds that Plaintiffs were employees and are entitled to back wages for their work.[2] Defendants oppose.[3]

For the following reasons, the Court **GRANTS** Plaintiffs' motion regarding whether Plaintiffs should receive back wages.

I. Background

Brass Pole is a gentleman's club.[4] Defendant Rowe owns and manages the

---
[1] Doc. 1.
[2] Doc. 17.
[3] Doc. 23. Plaintiffs replied. Doc. 22.
[4] Doc. 17-1 at 9.

Case No. 1:19-cv-00767
Gwin, J.

business.[5] Although some Brass Pole's workers are payroll employees, including Defendant Rowe, the managers, DJ, bouncer, bartenders, "door girl," and "house mom," Brass Pole does not pay the dancers anything.[6] Brass Pole claims the dancers are independent contractors.

Defendant claims that Brass Pole is a bar and grill.[7] Although the club has a license to serve food, it has no kitchen or menu.[8] If a customer asks for food a manager can tell them the price of sandwiches.[9] The club serves precooked foods, such as burgers and Hot Pockets, that it heats in a microwave.[10] Defendant Rowe purchases the food at Sam's Club.[11] Brass Pole also has a liquor license and serves beer, wine, and liquor that it purchases at a grocery store.[12]

Female exotic dancers perform semi-nude at the club during its operational hours.[13] Brass Pole's dancers receive compensation exclusively from tips and can earn tips in three ways. First, the club has a main stage with a pole that dancers can dance on.[14] Brass Pole does not pay dancers for dancing on the main stage. Dancers earn only whatever tips they receive from customers.[15]

Second, dancers can provide private lap dances to customers. For such dances, the customers pay nothing to Brass Pole. Instead, the customers pay the dancers a negotiated

---

[5] *Id.* at 4, 8.
[6] *Id.* at 10-12, 19.
[7] *Id.* at 9.
[8] *Id.* at 12.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.* at 15. While Defendant reported that the number of dancers working at any time could be between two or sixteen, in an earlier lawsuit Defendant reported that there were typically twelve to fifteen dancers per night. *Id.* at 13-14.
[14] *Id.* at 15.
[15] *Id.*

Case No. 1:19-cv-00767
Gwin, J.

fee.[16] Defendant Rowe says that the dancers are supposed to charge twenty dollars, but sometimes the women charge more.[17] Brass Pole requires the dancers pay twenty dollars to Brass Pole for the first private dance they perform each night. This "leasing space" charge decreases to five dollars for each additional dance.[18]

Finally, dancers can also make money by working in the VIP room.[19] Brass Pole charges customers fifty dollars to rent the room for fifteen minutes.[20] The dancers negotiate with the customer for payment for any work they perform in the VIP room and do not have to pay a portion to Brass Pole.[21]

Brass Pole advertises that it is hiring entertainers once a month in the *Chronicle Telegram*.[22] Women inquiring about a job must fill out an application.[23] Before working at Brass Pole, dancers must audition.[24] All dancers must be approved by Brass Pole, and dancers are not allowed to hire others to perform for them.[25]

Some dancers have experience prior to dancing at Brass Pole while others do not.[26] Dancers are not required to undergo training before performing, and Brass Pole does not provide any training.[27] Dancers are not required to have any specialized equipment for their jobs, but are responsible for purchasing their own outfits, makeup and shoes.[28]

---

[16] *Id.* at 14.
[17] *Id.* Plaintiffs say that Defendants set the rates they could charge. Docs. 17-2 at 2; 17-3 at 2.
[18] Doc. 17-1 at 14. Plaintiffs say this charge was fifteen dollars when they worked at Brass Pole. Docs. 17-2 at 2; Doc. 17-3 at 2.
[19] Doc. 17-1 at 14.
[20] *Id.* at 15.
[21] *Id.*
[22] *Id.* at 16.
[23] *Id.*
[24] Docs. 17-1 at 16; 17-2 at 1; 17-3 at 1.
[25] Docs. 17-1 at 17-18; 17-2 at 3; 17-3 at 3.
[26] Docs. 17-1 at 16; 17-2 at 1; 17-3 at 1.
[27] Docs. 17-1 at 19; 17-2 at 1; 17-3 at 1.
[28] Docs. 17-1 at 19; 17-2 at 1; 17-3 at 1.

Case No. 1:19-cv-00767
Gwin, J.

Brass Pole sets the hours of operation and is open six days a week from 4:00 p.m. to 2:30 a.m.[29] Brass Pole controls and pays for the lighting, decor, layout, music royalties, advertising, music systems, phone systems, software, and insurance.[30] Brass Pole charges five dollars for admission unless a customer has a free pass.[31] The club does not share the cover charge revenue with the dancers.[32]

On Thursday, Friday, and Saturday nights, the club uses a DJ.[33] The DJ downloads or streams music from the internet.[34] When the DJ is not there the manager controls the music.[35]

Brass Pole advertises in the *Chronicle Telegram* and on Facebook.[36] The club advertised Plaintiffs as Brass Pole dancers on Facebook.[37] Plaintiffs say that they personally used Snapchat, Facebook, and text messaging to contact customers regarding when plaintiffs would be dancing.[38]

Brass Pole enforces the state-mandated dress code for dancers.[39] The club keeps track of which dancers are present at the club through a sign-in sheet.[40] The DJ keeps track of the private dances and VIP room work that the dancers perform.[41]

The parties dispute the rules that Brass Pole enforces for its dancers. Plaintiffs claim

---

[29] Docs. 17-1 at 11.
[30] *Id.* at 18-19.
[31] *Id.* at 13.
[32] *Id.*
[33] *Id.* at 15.
[34] *Id.*
[35] *Id.* at 16.
[36] *Id.* at 20.
[37] Docs. 17-2 at 2-3; 17-3 at 2.
[38] Docs. 17-2 at 2; 17-3 at 2.
[39] Doc. 17-1 at 17.
[40] *Id.*
[41] *Id.*

Case No. 1:19-cv-00767
Gwin, J.

that Brass Pole required dancers to fill out a schedule.[42] The schedule required dancers to sign up for preset six-hour shifts. Plaintiffs say that Brass Pole required dancers to work six hours every time they came to dance.[43] Plaintiffs also say that Brass Pole requires dancers to work at least one weekday before dancers are allowed to work the busiest weekend nights.[44]

Defendant Rowe says that he tried to enforce a dancer schedule to insure dancer coverage, but it wasn't utilized.[45] He also disagrees that dancers need to work a weekday shift to work on the weekend.[46] Defendant claims that the six-hour shift is a suggestion but not a requirement.[47]

Plaintiffs say they were directly supervised by Brass Pole's managers and Defendant Rowe.[48] They say that management sent dancers home for failing to comply with the club's rules.[49] Plaintiffs report that they had to get approval from management to leave before the shift end.[50] Plaintiff Smith states that on April 15, 2019 she had to seek Defendant Rowe's approval to leave early for personal reasons.[51] Plaintiffs also say that dancers were fined for arriving late or leaving early and that Defendant Rowe fined Plaintiff Gilbo twenty dollars for leaving early.[52]

Defendant Rowe says that no one supervises the dancers.[53] He denies that dancers

---

[42] Docs. 17-2 at 2; 17-3 at 2.
[43] Docs. 17-2 at 2; 17-3 at 2.
[44] Docs. 17-2 at 2; 17-3 at 2.
[45] Docs. 17-1 at 25.
[46] *Id.*
[47] *Id.*
[48] Docs. 17-2 at 3; 17-3 at 3.
[49] Docs. 17-2 at 2; 17-3 at 2.
[50] Docs. 17-2 at 2; 17-3 at 2.
[51] Doc. 17-2 at 2.
[52] *Id.* at 3.
[53] Doc. 17-1 at 10.

Case No. 1:19-cv-00767
Gwin, J.

were fined for leaving early while Plaintiffs worked at Brass Pole.[54]

Defendant Rowe admits that the club uses sign-in sheets that track when dancers arrive, when they leave, and why they left early.[55] He says he uses the sign-in sheets so that the DJ can keep track of which dancers are available to call up to the stage and to help the bouncer knows who is there for safety reasons.[56] Defendant admits, however, that the DJ doesn't actually review the sign-in sheet.[57] He also says that the club doesn't have a reason for keeping track of dancers leaving early and why.[58]

Plaintiff Jamie Gilbo worked at Brass Pole from approximately August 14, 2018 to March 26, 2019.[59] Plaintiff Alyssa Smith worked at Brass Pole from approximately June 22, 2018 to June 3, 2019.[60] Plaintiffs say that they worked for Brass Pole while they were dancers at the Brass Pole.[61]

## II. Discussion

### A. Summary Judgment Standard

A party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[62] The Court views all of the evidence in the light most favorable to the nonmoving party.[63] The nonmoving party "must show sufficient evidence to create a

---

[54] *Id.* at 25.
[55] *Id.* at 26-27.
[56] *Id.* at 27.
[57] *Id.*
[58] *Id.*
[59] Docs. 17-2 at 1; 17-1 at 11.
[60] Doc. 17-3 at 1.
[61] Docs. 17-2 at 1; 17-3 at 1.
[62] Fed. R. Civ. P. 56(c).
[63] *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500-501 (6th Cir. 2007) (citation omitted).

Case No. 1:19-cv-00767
Gwin, J.

genuine issue of material fact."[64] There must be enough evidence for a jury to reasonably find for the nonmoving party.[65] A scintilla of evidence is not enough to defeat a summary judgment motion.[66]

### B. Plaintiffs Are Covered Individually by the FLSA.

The parties dispute whether the FLSA applies.

An employee can gain FLSA protection in two ways. First, employees of an enterprise engaged in the commerce or the production of goods in commerce have "enterprise coverage."[67] To qualify for enterprise coverage, a company must have at least $500,000 of gross sales.[68] Second, employees that are themselves engaged in interstate commerce or the production of goods in commerce are covered individually.[69]

Defendants claim that the FLSA does not apply to Brass Pole because Brass Pole's annual gross sales and business is less than $500,000.[70] Plaintiffs do not dispute that the Brass Pole has less than $500,000 gross sales but claim that the FLSA covers them as individuals.[71]

Plaintiffs argue that they are individually covered because they use the internet and cell phones, both instruments of interstate commerce, in their jobs. Specifically, Brass Pole

---

[64] *Id.* (citation omitted).
[65] *Id.*
[66] *Id.*
[67] *Kowalski v. Kowalski Heat Treating, Co.*, 920 F.Supp. 799, 802-803 (N.D. Ohio 1996).
[68] *Id.* at 803 n. 1.
[69] *Id.* at 803.
[70] Doc. 23 at 1. Defendants refer to Brass Pole's tax returns but have not submitted the tax returns or even the relevant numbers from those documents. Defendants only make the bare assertion that Brass Pole falls under the $500,000 threshold.
[71] Doc. 17 at 17-20. Defendant does not raise any arguments on this point, although it is the Plaintiffs' burden to prove that they qualify for FLSA coverage. *Miller v. Centerfold Entertainment Club, Inc.*, No. 6:14-CV-6074, 2017 WL 3425887, at *3 (W.D. Ark. Aug. 9, 2017).

Case No. 1:19-cv-00767
Gwin, J.

dancers perform to music downloaded or streamed from the internet.[72] Brass Pole advertises on the internet through Facebook.[73] Plaintiffs texted customers and also used the internet to contact customers directly about their work through Snapchat and Facebook.[74]

Other courts have held that using internet music gives exotic dancers individual FLSA coverage, because the internet is a well-established instrumentality of interstate commerce.[75] This Court agrees with those courts. "Plaintiffs were required to regularly use the [i]nternet to perform their dances . . .;" Plaintiffs used text messaging to contact customers; and both parties used the internet to advertise the dancers' services.[76] This satisfies the requirements for individual coverage under the FLSA.[77]

### C. Plaintiffs Were Employees of Brass Pole.

The Court next determines whether Plaintiffs Gilbo and Smith were employees of Defendant Brass Pole and therefore entitled to damages under the FLSA.[78]

The FLSA defines "employee" as "any individual employed by an employer."[79] The Sixth Circuit finds that "employees are those who as a matter of economic reality are dependent upon the business to which they render service."[80] Under the economic reality test, the Court examines six factors:

---

[72] Doc. 17-1 at 15.
[73] *Id.* at 20.
[74] *Miller,* 2017 WL 3425887, at *3.
[75] *Foster v. Gold & Silver Private Club, Inc.*, No. 7:14CV00698, 2015 WL 8489998, at 6 (W.D. Va. Dec. 9, 2015); *Miller,* 2017 WL 3425887, at *3-4.
[76] Docs. 17-1 at 15; 17-2 at 2; 17-3 at 2.
[77] Although Defendants argue that Brass Pole does not qualify for enterprise coverage, Plaintiffs only argue that they are covered individually, so the Court does not reach this question.
[78] Many state and federal courts have found that exotic dancers are employees. *See Shaw v. Set Enterprises, Inc.*, 241 F. Supp.3d 1318, 1323 n. 5 (collecting approximately thirty cases that found exotic dancers to be employees).
[79] 29 U.S.C. § 203(e).
[80] *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015) (citation omitted).

Case No. 1:19-cv-00767
Gwin, J.

> 1) The permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill; . . . 5) the degree of the alleged employer's right to control the manner in which the work is performed[; and] . . . 6) whether the service rendered is an integral part of the alleged employer's business.[81]

Defendant does not dispute that the second and sixth factors weigh in favor of Plaintiffs as "dancing was an integral part of Defendant's business and did not require a high degree of skill."[82]

The Court agrees that these two factors weigh in favor of finding Plaintiffs were Brass Pole employees. Defendant Rowe's deposition testimony and Plaintiffs' affidavits agree that no special skills were needed, and no training was required of or provided to dancers.[83] Other courts have held that dancers such as Plaintiffs "do not exhibit the skill or initiative indicative of persons in business for themselves."[84]

Additionally, the dancers are integral to Brass Pole's business. Indeed, in a 2016 case involving the same Defendant, that court agreed that the dancers were integral, stating that "[n]o reasonable juror could conclude that customers primarily came to the club for its other offerings, which included beer, liquor, and frozen burgers from Sam's Club."[85]

The Court must determine whether the other, disputed factors also weigh in favor of finding that Plaintiffs were employees.

### a. The Permanency of the Relationship

Independent contractors generally transfer from place to place as work is offered,

---

[81] *Id.*
[82] Doc. 23 at 5.
[83] Docs. 17-1 at 16,19; 17-2 at 1; 17-3 at 1.
[84] *Lester v. Agment LLC*, No. 1:15 CV 886, 2016 WL 1588654, at *5 (N.D. Ohio Apr. 20, 2016) (collecting cases).
[85] *Id.* at *7.

Case No. 1:19-cv-00767
Gwin, J.

whereas employees typically work for one employer in a "continuous and indefinite" relationship.[86] While this may be true, many groups, such as waiters or bartenders, are free to work at other establishments and are not permanent employees, but are nonetheless classified as "employees" under the FLSA.[87] Due to this, courts considering whether exotic dancers are employees have given this factor less weight in light of the nature of the dancers' work.[88]

In the present case, Plaintiffs Gilbo and Smith worked at Brass Pole for approximately seven and twelve months, respectively.[89] The Plaintiffs say that they worked for Brass Pole exclusively during that time. These Plaintiffs do not claim the Brass Pole prohibited them from working elsewhere.[90]

The Court agrees with the findings of other courts that the itinerant nature of exotic dancers' employment weighs in favor of Defendants.[91] Like others, however, this Court will also afford this factor less weight given the nature of the dancers' work.

### b. The Dancers' Investment

"[C]ourts must compare the worker's investment in the equipment to perform his job with the company's total investment, including office rental space, advertising, software, phone systems, or insurance."[92]

Both parties agree that Plaintiffs are only responsible for their own outfits, makeup,

---

[86] *Keller*, 781 F.3d at 807 (citation omitted).
[87] *Hart v. Rick's Cabaret Intern., Inc.*, 967 F. Supp. 2d 901, 921 (S.D.N.Y. 2013).
[88] *Id.* (collecting cases).
[89] Docs. 17-1 at 11; 17-2 at 1; 17-3 at 1.
[90] Docs. 17-2 at 1; 17-3 at 1.
[91] *Hart,* 967 F. Supp. 2d at 921; *Reich v. Circle C Investments, Inc.*, 998 F.2d 324, 328 (5th Cir. 1993); *Harrell v. Diamond A Entertainment, Inc.*, 992 F. Supp. 1343, 1352 (M.D. Fla. 1997).
[92] *Keller*, 781 F.3d 799, 810 (6th Cir. 2015).

-10-

Case No. 1:19-cv-00767
Gwin, J.

and shoes.[93]  They do not provide any investment or specialized equipment for the business.[94]

In contrast, Defendants pay for everything required to operate the business—the utilities, insurance, taxes, alcohol, food, paper products, advertising, music systems, software, downloaded music, and phone systems.[95]  Defendant Rowe said that Defendants invest "a couple hundred thousand" dollars in the business.[96]

On balance, it is clear that Defendants' investment in the business far outweighs Plaintiffs' investment.[97]  This factor weighs in favor of Plaintiffs.

### c. The Opportunity for Profit or Loss

The Court next examines the amount of control Defendants had over Plaintiffs' opportunity for profit or loss and whether Plaintiffs were able to increase their own profits through their management and technical skill.[98]

To a degree, Plaintiffs influenced the money they made each night.  Plaintiffs say that they directly contacted customers through Facebook, Snapchat, and text messaging to tell the customers they would be dancing at Brass Pole that night.[99]  Plaintiffs also controlled their own outfits.[100]  Construing the evidence in favor of Defendants, Plaintiffs could also determine which night to work and negotiate the fee for certain types of dances

---

[93] Docs. 17-1 at 19; 17-2 at 1; 17-3 at 1.
[94] Doc. 17-1 at 19.  Plaintiffs also state that they advertised their work through Facebook, Snapchat, and text messages, leading to the conclusion that they invested in cell phones as well.  Common items that most people use daily (i.e. cars, computer equipment, hand tools) are not typically considered as evidence of economic independence in determining whether an individual is an independent contractor.  *Keller*, 781 F.3d at 810-11.
[95] Doc. 17-1 at 12-13, 19.
[96] *Id.* at 19.
[97] *Kimbrel v. DEA Corporation*, No. 3:14-CV-161-TAV-CCS, 2016 WL 7799340, at *7 (E.D. Tenn. Aug. 2, 2016) (finding that investment factor weighed in favor of plaintiffs "like nearly every court that has addressed this issue").
[98] *Keller*, 781 F.3d 799, 812 (6th Cir. 2015).
[99] Docs. 17-2 at 2; 17-3 at 2.
[100] Docs. 17-1 at 19; 17-2 at 1; 17-3 at 1.

-11-

Case No. 1:19-cv-00767
Gwin, J.

directly with the customers.[101]

Despite the Plaintiffs' control over certain aspects of their work at Brass Pole, Defendants' actions influenced Plaintiffs' earnings to a much greater degree. Brass Pole "ha[d] a significant role in drawing customers to its [club],"[102] which is the "critical factor in determining profits and losses of both defendants and plaintiffs."[103] Defendants were responsible for "advertisement, location, business hours, maintenance of facilities, aesthetics, and inventory of beverages and food."[104] Given Defendants' high degree of control over customer volume, this factor weighs slightly in Plaintiffs' favor.

### d. The Degree of Control

In 2016, Defendant Brass Pole was sued by a different group of dancers who also claimed that Defendant incorrectly categorized them as independent contractors and failed to pay required wages.[105] In that lawsuit, the court found that, among other factors, Defendant exercised a great degree of control over the dancers' work through a contract called "Talent Conditions of Leasing the Premises," which set rules for Brass Pole dancers.[106]

Defendant Rowe reports the earlier lawsuit, Brass Pole did away with earlier contract, no longer tells dancers "when to come and when to go," and quit telling dancers they had to work weekdays."[107] Defendants say the only dress code enforced is the state

---

[101] Doc. 17-1 at 14, 25.
[102] *Reich*, 998 F.2d 324, 328 (5th Cir. 1993); *Lester*, 2016 WL 1588654, at *6 (collecting cases holding that exotic dancers' opportunity for profit or loss is largely determined by establishments).
[103] *Lester*, 2016 WL 1588654, at *6.
[104] *Id.*
[105] *Lester,* 2016 WL 1588654.
[106] *Id.*
[107] Doc. 17-1 at 32.

Case No. 1:19-cv-00767
Gwin, J.

law and that dancers are only sent home if they aren't complying with the law.[108]

As discussed above, Plaintiffs dispute Defendants' characterization of the rules imposed on the dancers. Plaintiffs report that dancers were not able to come and go at will. Plaintiff Gilbo says she was fined for leaving early, and Plaintiff Smith says she had to seek permission to leave.[109] Plaintiffs also say that they were required to work on weekdays.[110] Plaintiffs say that Defendants set the rate for private and VIP room dances.[111]

Despite the dispute regarding what rules remain in effect, Defendants still leave important facts undisputed. Defendant Rowe admits that while Plaintiffs danced at Brass Pole he tried to implement a schedule with suggested six-hour shifts. He also admits that Brass Pole uses a sign-in sheet to record when the dancers arrive, leave, and their reasons for leaving early.[112]

Under this factor, the operative question is whether Plaintiffs control so much of the business that they "stand as separate economic entit[ies]" or whether their "economic status is inextricably linked to those conditions over which defendants have complete control."[113]

Even though Defendants deny any control over the dancers aside from enforcing state laws, at least one court has found that a club that similarly denied dancer control except for state laws still exercised control over the dancers through the "atmosphere, clientele, and operation of the club."[114] Other courts have similarly found that setting the hours of operation, cover charge, types of food and beverages sold, location, and facility

---

[108] *Id.* at 17, 29.
[109] Docs. 17-2 at 3; 17-3 at 2.
[110] Docs. 17-2 at 2; 17-3 at 2.
[111] Docs. 17-2 at 2; 17-3 at 2.
[112] Doc. 17-1 at 25-27.
[113] *Reich v. Priba Corp.*, 890 F. Supp. 586, 592 (N.D. Tex. 1995) (citation and quotations omitted).
[114] *Butler v. PP&G, Inc.*, No. WMN-13-430, 2013 WL 5964476, at *4 (D. Md. Nov. 7, 2013).

Case No. 1:19-cv-00767
Gwin, J.

maintenance meant that dancers were "entirely dependent on the [club] to provide [them] with customers, and [their] economic status [was] inextricably linked to those conditions over which [the club had] complete control."[115]

Plaintiffs in this case report that they made efforts to bring patrons to the club, but there is no doubt that Defendants controlled the flow of club customers. Defendants chose the location and hours of operation.[116] Defendants also decided whether to charge a cover fee and what beverages and food would be provided.[117] Additionally, Defendants controlled the club's atmosphere.[118]

Even in light of the parties' dispute regarding the Defendants' rules for dancers, this factor weighs in favor of Plaintiffs.

### e. Weighing all factors

Construing the disputed facts in Defendants favor still leads to the conclusion that the Plaintiffs were employees under the FLSA. Although the parties disagree as to some of the rules Defendants imposed on dancers, a reasonable jury could only conclude, given the totality of the facts, that Plaintiffs were economically dependent upon Defendants under the economic reality test. Therefore, Plaintiffs were employees.

### D. Defendant Rowe Is Jointly Liable for Plaintiffs' Damages.

Plaintiffs argue that in addition to Brass Pole, Defendant Rowe should be found to be an employer under the FLSA and personally liable for Plaintiffs' damages.[119]

---

[115] *Id.; see also McFeeley v. Jackson Street Entertainment, LLC*, 47 F. Supp. 3d 260, 269 (D. Md. 2014), *aff'd*, 825 F.3d 235 (4th Cir. 2016).
[116] Doc. 17-1 at 11-13.
[117] *Id.*
[118] *Id.*
[119] Doc. 17 at 20-22. Defendants did not submit any argument on this point.

-14-

Case No. 1:19-cv-00767
Gwin, J.

To be personally liable, Defendant Rowe must meet the FLSA definition of "employer," defined to "include[] any person acting directly or indirectly in the interest of an employer in relation to any employee."[120] More than one employer can be liable for FLSA obligations.[121] An individual's status as an employer is a legal determination for the court based on the economic realities of the case.[122]

While no single factor controls an individual's status, courts examine whether the person has a "significant ownership interest in the corporation" and "control over significant aspects of the corporation's day-to-day functions."[123] The individual does not need have exclusive control over the day-to-day operations as long as he or she controls significant aspects of the daily functions.[124]

Defendant Rowe's ownership and control over Brass Pole makes him an employer. Rowe is the sole owner, managing member, and President of Brass Pole.[125] He also owns and controls the company that owns the Brass Pole's building and the land it sits on.[126] Defendant Rowe controls daily operations at the club. He sets the hours of operation, has sole check-signing authority, and purchases the food and beverages.[127]

Although Brass Pole's managers may have some control over operations and handle matters such as auditions, Rowe directly supervises the managers and tells them what to

---

[120] 29 U.S.C. § 203(d).
[121] *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991).
[122] *Id.*
[123] *Id.* at 966 (finding liability where the individual was the COO, had a significant ownership interest, and controlled parts of the company's day-to-day functions); *see also Kimbrel,* 2016 WL 7799340, at *13 (finding individual liability where the individuals were the sole owners, made hiring and firing decisions, drafted the contract with dancers, set rules and policies, maintained financial records, ensured compliance with rules, supervised workers, and could waive rules); *Acosta v. CPS Foods, Ltd.*, 2017 WL 5157238, at *4-5 (N.D. Ohio Nov. 3, 2017) (holding individual liable where she was heavily involved in the day-to-day management of the restaurant she owned).
[124] *Dole,* 942 F.2d at 965.
[125] Doc. 17-1 at 4, 8.
[126] *Id.* at 5.
[127] *Id.* at 4, 11-12.

Case No. 1:19-cv-00767
Gwin, J.

do.[128]  He and the general manager run the business day-to-day, and he and the managers have the ability to hire and fire employees.[129]  Defendant Rowe made the decision to classify the dancers as independent contractors.[130]

Because Defendant Rowe is the sole owner of the business and significantly controls daily operations, Defendant Rowe is jointly liable for Plaintiffs' damages.

### E.  Plaintiffs Are Entitled to Recovery.

Plaintiffs assert both FLSA and Ohio law claims regarding their unpaid wages. "Ohio law incorporates the FLSA's definitions, standards, and principles for its minimum wage and overtime compensation provisions."[131]  Despite the fact that the two statutes rely upon the same standards, Ohio law provides for greater damages, essentially three times the amount of back wages, whereas federal law only allows for double the amount of back wages.[132]  Given the higher potential for recovery, Plaintiffs ask for damages under Ohio law.[133]

The parties agree that Defendants did not pay Plaintiffs wages under Ohio law.[134]  Plaintiffs are therefore entitled to back wages under Ohio law.  During Plaintiffs' periods of employment, in 2018 and 2019, the applicable minimum wage was $7.25 per hour.[135]

---

[128] *Id.* at 10.
[129] *Id.* at 10, 16.
[130] *Id.* at 11.
[131] *Pineda v. Pit Columbus, LLC*, No. 2:17-cv-668, 2017 WL 5900559, at *2 (S.D. Ohio Nov. 28, 2017).
[132] Specifically, under Ohio law an employer must pay back wages plus damages, where "[d]amages [are] calculated as an additional two times the amount of the back wages."  Ohio Const., Art. II, § 34a.  Under federal law, an employer must pay "unpaid minimum wages . . . and [ ] an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).
[133] Doc. 17 at 23.
[134] It is clearly established that Defendants did not pay Plaintiffs anything.  Docs. 17-1 at 23; 17-2 at 1; 17-3 at 1.
[135] The Ohio Constitution sets the parameters for the annual increase of Ohio's minimum wage.  Ohio Const., Art. II, § 34a.  Ohio's director of commerce adjusts the wage rate according to the constitutional provision.  Ohio Rev. Code § 4111.02.  In 2018, the Ohio department of commerce mandated that all employers who grossed less than $305,000 pay their employees at minimum the federal minimum wage.  Ohio Dept. of Comm., 2018 Minimum Wage, https://www.com.ohio.gov/documents/dico_2018MinimumWageposter.pdf (last accessed Feb. 13, 2020).  In 2019 an

Case No. 1:19-cv-00767
Gwin, J.

Despite Ohio law requiring employers to keep records of employees' hours for at least three years following the employees' final date of employment,[136] Brass Pole has only produced partial records of Plaintiffs' hours in the form of sign-in sheets.[137]

Courts hesitate to punish employees when an employer's incomplete records leave hours-worked questions. Instead, if an employee can prove that he or she performed the work for which he or she seeks compensation and provide sufficient evidence of the work "as a matter of just and reasonable inference," the burden shifts to the employer to contradict the employee's claim with evidence of the precise amount of work or evidence to negate the inference drawn from the employee's submissions.[138]

Plaintiffs have submitted a partial set of Brass Pole dancer sign-in sheets.[139] The documents show that Plaintiff Gilbo worked 672.04 hours and that Plaintiff Smith worked 545.68 hours during their period of dancing for Brass Pole.[140] Based on the records available, Plaintiffs worked an average of 4.23 hours and 2.66 hours per day, respectively.[141] There are sign-in sheets missing from 34 days during the period Gilbo worked at Brass Pole. For Smith, 92 days' sig-in sheets are missing. Applying average hours worked to the days for which Brass Pole did not produce sign-in sheets, Gilbo estimates that she worked 143.82 unaccounted for hours, while Smith worked 244.72

---

employer grossing less than $314,000 had to pay the federal minimum wage. Ohio Dept. of Comm., 2019 Minimum Wage, https://www.com.ohio.gov/documents/dico_2019MinimumWageposter.pdf (last accessed Feb. 13, 2020). In both years, the federal minimum wage was $7.25. The record does not reflect the Brass Pole's gross income from 2018 or 2019, but Plaintiffs only seek the federal minimum wage, which in both years was lower than Ohio's minimum wage rate. Doc. 17 at 17.

[136] Ohio Const., Art. II, § 34a.
[137] Doc. 17-8.
[138] *Cole,* 62 F.3d at 779.
[139] Doc. 17-8.
[140] Docs. 17-4; 17-5. These numbers have been rounded to the nearest hundredth of an hour.
[141] Docs. 17-4; 17-5.

Case No. 1:19-cv-00767
Gwin, J.

hours.[142]

In total, Gilbo claims she was denied $5,914.99 in minimum wages. Smith claims she was denied $5,730.42.[143] With an additional two times the amount of unpaid wages, Plaintiffs estimate that their damages total $17,744.97 and $17,191.26, respectively.[144]

Defendants have not disputed these calculations, challenged the method of calculating the damages, or put forth their own estimation. In fact, Defendant has been entirely silent on this point.[145]

Because Plaintiffs' estimations are reasonable based upon the available records and because Defendants have failed to meet their burden of rebutting Plaintiffs' estimated damages, the Court awards Plaintiff Gilbo $17,744.97 in damages and Plaintiff Smith $17,191.26 in damages.

### III. Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiffs' motion for summary judgment as to Counts I and II. Defendants are jointly liable for the damages granted to Plaintiffs, Plaintiff Gilbo shall receive $17,744.97 in damages and Plaintiff Smith $17,191.26 in damages.

Plaintiffs are ordered to notify the Court by February 24, 2020 as to whether they plan to proceed to trial on Plaintiffs' Counts III, IV, and V regarding overtime and tip violations.

---

[142] Docs. 17-4; 17-5.
[143] Docs. 17-4; 17-5.
[144] Doc. 17 at 26.
[145] Doc. 23.

-18-

Case No. 1:19-cv-00767
Gwin, J.

    IT IS SO ORDERED.

Dated: February 14, 2020                      *s/      James S. Gwin*
                                                          JAMES S. GWIN
                                                          UNITED STATES DISTRICT JUDGE